UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Richard R. Hooker, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 13 CV 50163 |
| | ) Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Richard R. Hooker ("Claimant") brings this action under 42 U.S.C. §405(g), seeking remand of the decision denying him disability insurance benefits under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment.

**BACKGROUND**

**A.    The Hearing Before The Administrative Law Judge.**

The Claimant filed an application for disability on November 24, 2009. R. 22. The administrative law judge ("ALJ") conducted a hearing on October 27, 2011. The Claimant, Medical Expert Dr. Hugh Savage, and Vocational Expert James Breen testified at the hearing.[1] R. 42, 44, 84.

The Claimant testified that he was 52 years old at the time, right-handed, five feet nine inches tall, and weighed 190 pounds. R. 63-64. The Claimant lived in a house with his adult son. The Claimant possessed a driver's license and drove every day. He testified that he drove to his brother's house, an hour's drive away, and to the store, which was five miles away. R. 64-65,

---

[1] The transcript states that a "non-attorney representative" appeared with the Claimant. R. 38. However, this person is otherwise referred to as an attorney, and a search of the Illinois Attorney Registration and Disciplinary Commission's website shows that this person is an attorney.

1

83. When driving to his brother's house, the Claimant would stop for 5 to 10 minutes. The Claimant would drive to his brother's house twice a month. At the time of the hearing, the Claimant still had a commercial driver's license. The Claimant possessed a GED. R. 65.

The Claimant testified about the following impairments. He had constant burning in his left shoulder. R. 66. The burning feeling went from his neck about half way to his elbow. R. 81. On a scale of 1 to 10, the pain was "[p]robably about a five." R. 82. The Claimant testified that aspirin helped the pain, but not much. R. 82. He had two surgeries on his left shoulder. R. 67. The Claimant treated his shoulder pain by taking warm showers, and previously received cortisone injections. R. 68. He also avoided sleeping on his left shoulder. He stopped taking medication for his left shoulder because he could not afford it. R. 68. According to the Claimant, the two previous surgeries on his left shoulder helped, but one day when he reached across with his left arm, he had severe pain. R. 69. The Claimant also testified that he had surgery on his right shoulder and that "long periods of stretching bothers both of [his] arms." R. 67, 69. Similarly, he testified, "It bothers me when I stretch it a long time." R. 70.

The Claimant's foot also hurt. R. 66. The Claimant conceded that wearing soft soled shoes helped, and that a Flexeril patch also worked. However, he could no longer afford the patch. R.70. The Claimant's foot hurt when he wore hard soled shoes, such as work boots, but not when he wore soft soled shoes. R. 79. The Claimant testified that he guessed he could walk a quarter mile, and could only stand in place for 5 to 10 minutes before he had to change positions. R. 75. The Claimant's foot hurt mostly at night. R. 82.

According to the Claimant, his lower back hurt if he sat or stood "too long." R. 67. The Claimant testified that his back caused him pain, and that if he slept on his belly he would be in "[a] lot of pain." R. 71. However, the Claimant described his lower back pain as "minimal" at the

2

time of the hearing. R. 82. The Claimant testified that after sitting for 30 minutes he needed to get up. R. 76. The Claimant had a fusion for his neck. R. 67. He said that recently his neck "locks up." R. 71.

The Claimant testified that he would go to bed at 10:00 p.m. but woke up around 4:30 a.m. and then would sleep another 3 hours during the day. R. 72. When he woke up, he would get something to drink and smoke a cigarette. R. 73. According to the Claimant, he was usually tired. R. 72. The Claimant smoked about a pack and a half of cigarettes a day. R. 80.

The Claimant also testified to his ability to perform daily chores. For example, the Claimant admitted he showered, dressed and fed himself, and did household chores (vacuuming, dusting, taking out garbage). R. 73-74. The Claimant did need help, however, if he was required to lift something heavy, such as a piece of furniture. The Claimant also built model planes. R. 74. However, he would get bored and put it down. R. 75. The Claimant admitted he had no difficulty with his fingers, manipulation or grip. R. 78. The Claimant testified that he attempted to find work by "ask[ing] around." R. 81. The Claimant also testified about how much weight he could lift, an issue discussed in greater detail below.

Dr. Hugh Savage testified as the medical expert. He is board certified in internal medicine and cardiovascular disease. R. 42 As the testifying medical expert, Dr. Savage did not examine or treat the Claimant. Instead, he reviewed the Claimant's medical records. R. 43. Dr. Savage testified that the Claimant was suffering from the following impairments: "[S]tatus post rotator cuff and biceps tear bilaterally. Right foot pain due to TMT arthritis. Low back pain. Osteoarthritis. Left shoulder mild acromioclavicular joint degenerative disease." R. 43. Dr. Savage opined that the Claimant did not meet or equal a Listing. R. 45.

Critical to this case, Dr. Savage credited the opinion of the consulting physician over the opinion of the Claimant's treating physicians. Dr. Savage did so because of the "significant disparity between the amount of weakness" identified by the Claimant's two treating physicians. R. 45. He noted that one treating physician believed that the Claimant could frequently lift between 10 to 20 pounds and occasionally lift between 20 to 50 pounds. R. 46. In contrast, the Claimant's other treating physician stated that the Claimant could occasionally lift between 0 and five pounds. According to Dr. Savage, this was a "marked disparity" that impressed him. R. 46. Dr. Savage then contrasted this seemingly conflicting treating physician evidence with the consultative examination, which did not indicate those types of limitations. R. 46.

With respect to the impairments he identified, Dr. Savage noted the following. As to the Claimant's foot, the Claimant was told to treat the impairment by taking NSAIDS, such as Motrin, and wearing a "rocker bottom foot type shoe." R. 45. He noted that the medical record also indicated that the Claimant's foot was not fractured. R. 48. Dr. Savage also noted that the Claimant's physician told him to return for follow-up for the foot, but the Claimant never did. R. 48. As to the Claimant's back, the consultative exam's finding that the Claimant's lumbar spine range of motion was normal "impressed" Dr. Savage. R. 47. As to the Claimant's neck, Dr. Savage stated that the Claimant had surgical fusion and radiculopathy, but was "well healed." R. 48. According to Dr. Savage, the radiculopathy caused numbness in the Claimant's arm but not a loss of strength, which Dr. Savage saw as being less problematic. R. 49. In doing so, Dr. Savage noted that the medical records indicated that the Claimant had no significant decrease in grip strength and that the Claimant had full power in all extremities. R. 49.

On cross examination, Dr. Savage admitted that the Claimant had a "small tear" of his left rotator cuff, and that this tear could limit the Claimant. R. 50. Dr. Savage also conceded that

the consultative examination did not mention the Claimant's re-tear of his left rotator cuff. R. 51. Dr. Savage minimized the significance of this omission by noting that the consultative examination still showed no significant decrease in the Claimant's range of motion. R. 51, 54. According to Dr. Savage, the examinations performed by the Claimant's treating physicians did not show "any significant severity." R. 54. Dr. Savage believed that the examinations showed that the Claimant's decrease in strength was "trivial;" the test indicated the Claimant's left arm strength was "four plus to five minus" out of five. R. 55. Dr. Savage also noted that the Claimant did not have additional surgery on his left rotator cuff after the Claimant's physician informed the Claimant of surgery as an option. On cross examination, Dr. Savage conceded that he was not an orthopedic doctor and was unfamiliar with the tests performed on the Claimant. R. 58. These tests included O'Brien's test, Speed test, and Yergason test. R. 60.[3]

The vocational expert, James Breen, also testified about the type of jobs the Claimant could work. Because the parties have not raised any issues relating to this testimony, the Court will not summarize it here.

**B.     The Medical Evidence**

Although the record on appeal contains voluminous medical records, the primary medical records, both in the file and at issue on appeal, relate to the Claimant's shoulders (mainly the left shoulder), back and neck. The following is a summary of the highlights of this treatment, with specific issues discussed further in the analysis below.

A June 4, 2009, MRI of the Claimant's left shoulder showed a full-thickness tear. R. 334.

An August 6, 2009, progress note by Dr. Giridhar Burra states that the Claimant presented "for followup of his retear of the supraspinatus with previous rotator cuff repairs times

---

[3] All of these tests are used to determine damage to the shoulder, including, but not limited to, labral tears or bicipital tendonitis.

2 of the left shoulder." R. 339. This progress note goes on to state that the Claimant received Marcaine injections at his last visit, which helped relieve the pain for a few days. The note further states that according to the Claimant "he has fairly good strength and notices that he can function on a day-to-day basis with this new tear; however, the pain is what limits him." R. 339. The progress note states that the Claimant denied any acute injury, numbness or tingling distally. But the progress note states that the Claimant "started to experience locking on a very occasional basis." R. 339. The progress note also describes the results of the Claimant's physical exam completed on August 6, 2009. The examination of the left shoulder showed forward flexion to 150 degrees and that passively, the Claimant could extend to 170 degrees. The Claimant's external rotation was about 90 degrees and internal rotation was about 50 degrees. The Claimant's rotator cuff strength was 4+/5, but his bicep, deltoid and tricep strength were all 5/5. Several tests were conducted on the Claimant; he had negative Speed, Gerber, Yergason and belly press tests. But the Claimant had a "[v]ery positive O'Brien test." R. 339. After noting the finding of a "[l]eft shoulder retear of the supraspinatus with a history of two rotator cuff surgeries with revision of the left shoulder," a plan was prescribed:

> Since the patient was told at his last visit his options and the success rates of a third rotator cuff repair are not as good as his first rotator cuff repair, he has opted to continue conservative management versus surgical options. He would like to go ahead with the cortisone injection for the pain and in the future he understands that he may experience more locking, as this rotator cuff tear turns into a rotator cuff arthropathy in the long run. He understands that he may be a candidate for a reverse total shoulder procedure in the very far future, but he is looking for relief now to buy him some time which is completely agreeable to us.

R. 339.

A September 4, 2009, progress note described a physical examination of the Claimant that was nearly identical to the August 6, 2009, physical examination, with respect to the Claimant's left shoulder. R. 342. However, the Claimant's cervical spine was also examined

6

that day. This exam showed a "range of motion that is full with exacerbation of the radiculopathy bilaterally with neck flexion." R. 342. According to the Claimant, the radiculopathy went to all fingers on both hands. R. 342. Although the examination was positive with a Spurling test, it was "[n]egative Tinel bilateral elbows. Negative median nerve compression to bilateral elbows." R. 342.[4] The progress note shows a finding of a left shoulder tear of the rotator cuff and "[c]ervical radiculopathy status post a cervical fusion." R. 342. As a result, the Claimant was referred to Dr. Lorenz for the cervical spine complaints. The doctors were "to differentiate what [was] coming from the shoulder, what [was] coming from the neck." R. 342.

On September 10, 2009, as reported by Dr. Lorenz, an x-ray of the Claimant's back stated, "The x-ray demonstrates a well-healed fusion at C6, C7 and only minor degenerative changes at the level above." R. 346.

Both Dr. Burra and Dr. Lorenz completed agency forms setting forth their opinions of the Claimant's problems and abilities. These two forms are important for the treating physician argument below. On April 16, 2010, Dr. Lorenz completed a form entitled "Cervical Spine: Impairment Questionnaire." Ex. B4F. Dr. Lorenz stated that he first started treating the Claimant on September 7, 2005 and that his most recent exam was on September 10, 2009. In the diagnosis portion he wrote: "Well-healed fusion C6, C7 with radiculopathy." R. 323. As for the location of clinical findings, he wrote left shoulder and right arm numbness and noted that the Claimant had "ongoing shoulder problems for which he is being treated by Dr. Burra." R. 323-24. He stated that the neck and right shoulder pain was constant. R. 325. He estimated that the Claimant could sit for one hour and stand for one hour in an eight-hour day. R. 326. He stated that the Claimant could occasionally lift between 20 and 50 pounds and could frequently lift up

---

[4] Spurling test is used to assess nerve root pain (radiculopathy).

to 20 pounds.  R. 326.  He estimated that the Claimant's pain would interfere frequently with his attention and concentration and that he would have to frequently take unscheduled breaks of 5 to 10 minutes.  R. 327-28.  Finally, he estimated that the Claimant would miss work more than three times a month.  R. 329.

On July 17, 2011, Dr. Burra completed a form entitled "Upper Extremity:  Impairment Questionnaire." Ex. B9F.  He stated that he first treated the Claimant on July 7, 2006 and last saw him on October 19, 2009.  R. 374.  He diagnosed the Claimant with a re-tear of the left rotator cuff and referred claimant for an MRI supporting the diagnosis.  R. 375.  He stated that the Claimant had both loss of strength and pain in the left shoulder.  He stated that the Claimant could occasionally lift 5 pounds.  He wrote the words "left shoulder/arm" in the margin, suggesting that this limitation may have been just for the left arm.  R. 377.  He estimated that the Claimant would miss work 2 to 3 days a month.  R. 378.

## C.     The ALJ's Decision

On December 13, 2011, the ALJ issued her decision denying the claim for benefits. The ALJ found that the Claimant had the following severe impairments: (a) status post rotator and biceps tear bilaterally; (b) right foot pain due to arthritis; (c) low back pain, (d) osteoarthritis; (e) degenerative joint disease of the left shoulder; and (f) a history of cervical fusion with residual radiculopathy. R. 24. The ALJ found that these impairments did not meet or equal one of the listed impairments. The ALJ found that the Claimant had a residual functional capacity to perform light work with the following limitations: "occasional foot operation on the right; no climbing ladders, ropes or scaffolds; occasional climbing of ramps or stairs, crawling, crouching, balancing and kneeling; no overhead reaching with left shoulder; occasional overhead reaching with right shoulder; frequent reaching aside from overhead; avoid uneven terrain; no commercial

driving; and avoid concentrated exposure to moving machinery, unprotected heights, and hazardous machinery." R. 25.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

The Claimant asserts two arguments for remand. First, the ALJ failed to follow the treating physician rule. 20 C.F.R. § 404.1527(c)(2). Second, the ALJ improperly evaluated his credibility by failing to include any discussion of his pain symptoms.

After reviewing the briefs, the Court agrees that a remand is appropriate. The treating physician rule requires the SSA decision makers to "consider *all*" of the following factors in deciding the weight to give to *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). They are designed to help the ALJ "decide how much weight to give to the treating physician's evidence." *Id.* But within the weighing process, treating physician opinions receive particular consideration. A treating physician's opinion is entitled to "controlling weight" if it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is (ii) "not inconsistent with the other substantial evidence in [the] case." *Id.*; *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). This is the first step in the process. If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must proceed to the second step and determine what specific weight, if any, the opinion should be given by using the checklist factors described above. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009); *Bauer*, 532 F.3d at 608.

Here, the ALJ did not analyze either of these two steps in rejecting the opinions of the Claimant's treating doctors, Dr. Burra and Dr. Lorenz. The ALJ's analysis is contained primarily

10

in one long paragraph. *See* R. 27-28. There, the ALJ first listed the checklist factors.[5] Next, the ALJ stated: "As an initial matter, neither opinion [*i.e.* from Dr. Lorenz or Dr. Burra] is entitled to controlling weight as they are inconsistent with both the medical expert and the review DDS physician opinions." R. 27-28. This sentence, with its references to "initial matter," "controlling weight," and "inconsistent," clearly seems to be an attempt to apply the first step. In the remaining portion of the paragraph, the ALJ offered several additional reasons for why the opinions of these two doctors were also not entitled to "great weight." This seems to be an effort to apply step two.

Considering first the analysis at step one, the Court finds that the single sentence quoted above is not an adequate explanation. As a general matter, it is conclusory and contains no discussion of the specific evidence and thus does not provide any concrete explanation for why the opinions of these two doctors did not meet the step one standard. This is not the type of serious discussion required by the Seventh Circuit. *See Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012) (remanding: "We do not know what the ALJ thought about most of [the treating physician's notes over many years], because [the ALJ] never seriously discussed it"). More specifically, the ALJ did not address the two sub-parts in the step one analysis. The first sub-part asks whether the opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques." The ALJ did not directly answer this question. Earlier in the opinion, the ALJ summarized in narrative format some of the doctors' findings. This summary suggests that the ALJ may have believed there were not any clinical or laboratory diagnostic techniques

---

[5] The ALJ gave a slightly different formulation than the one listed above, setting forth seven instead of six factors, but this formulation is essentially the same as the ALJ merely added several qualifying requirements, such as the gateway requirement that an opinion should be from an acceptable medical source. There is no issue here about whether any opinion is from an acceptable medical source.

11

used in evaluating the claimant. But merely pointing back to this long narrative is not a proper explanation. For one thing, the ALJ never *analyzed* the evidence, thus requiring this Court to guess what the various clues cryptically interspersed in the narrative mean. For another thing, the narrative is not complete. It gives the impression that there was no confirmatory evidence regarding the claimant's shoulder and spinal problems. It is true, as the ALJ reported, that some of the tests Dr. Burra and Dr. Lorenz performed in office visits showed no limitations and thus support the ALJ's analysis. However, the ALJ left out of her summary other tests that were less clear-cut. These are summarized in the Claimant's opening brief. *See* Dkt. #17 at pp. 2-5, 10-11. For example, on June 4, 2009, Dr. Burra conducted a physical exam and found that the Claimant tested very positive on the O'Brien's test, the Speed test, and the Yergason test. Also, x-rays and MRIs were performed. Because the ALJ never discussed or analyzed this evidence, this Court cannot determine whether the ALJ considered it, which in turn makes it difficult to determine whether the ALJ applied the first sub-part of step one.

As for the second sub-part for step one—whether the treating physicians' opinions were "not inconsistent with the other substantial evidence in the case"—the ALJ at least alluded to this requirement, but the ALJ nonetheless failed to examine the entire record. Again, there is the problem that much of the ALJ's analysis seems to be buried implicitly in the narrative portion of the opinion. To cite one example, the Claimant complains that the ALJ misleadingly suggested in this narrative that the Claimant's shoulder was not serious because he declined Dr. Burra's offer to operate. The ALJ summarized this evidence as follows:

> Dr. Burra offered surgical repair of the rotator cuff, for a second time, but the claimant wished to avoid surgery and Dr. Burra offered activities to avoid and a home exercise program with instructions to follow up as needed.

R. 26. It is not clear whether the ALJ was in fact drawing negative inferences from this summary. Was this a part of her analysis? In any event, this summary leaves out important contextual details. This would have been the Claimant's third, not his second surgery. More importantly, Dr. Burra advised the Claimant that a third surgery had low odds of working. *See* R. 305-06 ("Surgical intervention with a second revision would be extremely complex with a very guarded prognosis because of the difficulty in getting a few anchors to bite in this tissue, which has already been operated on twice."). Dr. Burra also noted at another visit that the Claimant's decision not to do the third surgery was "justified" in light of the problems described above. R. 298. The ALJ's narrative leaves out these facts. The failure to include these contextual facts and also the failure to be explicit about what weight, if any, the ALJ placed on this issue is an example of the larger problem of not explicitly analyzing the evidence to show why the ALJ believed that the treating physicians' opinions were inconsistent with *substantial* medical evidence.

In sum, the ALJ cavalierly glossed over the first step without providing any analysis. The SSA's own interpretative rulings caution against this type of nonchalant treatment of treating physician opinions. *See* SSR 96-2p.

Turning to the second step of the treating physician rule, the Court notes that here the ALJ at least provided several reasons to support the conclusion. However, the ALJ never applied the checklist factors. Although the ALJ's reasons (discussed further below) may arguably *implicitly* address *some* of the checklist factors, she clearly did not analyze three important factors. There is no discussion of the first two factors: "the length of treatment" and "the nature and extent of the treatment relationship." The ALJ did not acknowledge, either in the paragraph or in the narrative portion of the opinion, that the Claimant had been treated by Dr. Burra and Dr.

13

Lorenz over a several-year period and had been seen by them multiple times. Dr. Burra had been treating the Claimant since July 7, 2006, and Dr. Lorenz had been treating him since September 7, 2005. R. 323, 374.

The ALJ likewise failed to address the fifth factor ("the physician's degree of specialization"). The ALJ gave no weight to the fact that Dr. Burra and Dr. Lorenz were both orthopedic specialists and that the medical expert and agency physician had no specialty in this area. R. 42, 329, 379. Her only discussion of this general issue was the following:

> The claimant's representative was asked at the beginning of the medical expert's testimony whether there were any questions or objections to the medical expert's qualifications. The representative did not have any, but then after the medical expert's testimony, the representative argued that the medical expert's opinion was not entitled to any weight because he is not an orthopedic specialist. I do not give any weight to this objection post-testimony as I find the medical expert to have experience and agency knowledge sufficient to issue an opinion in this case.

R. 26-27. But this explanation is not a substitute for an analysis. The mere fact that the Claimant's counsel did not object *before* the expert testified does not mean the ALJ can ignore this factor. The ALJ's assertion that the medical expert had "sufficient" experience is merely a conclusion. The ALJ never acknowledged that when asked certain questions by the Claimant's counsel, Dr. Savage demurred by stating: "I'm not an orthopedic surgeon of course, and so I have to look at this from more [of] an internal medicine and general medical view[.]" R. 54. Later, when asked about a specific diagnostic test that the Claimant's treating doctors performed (the O'Brien's test), Dr. Savage stated that he had never heard of it. R. 58.

In sum, the ALJ did not evaluate, either implicitly or explicitly, *all* of the checklist factors, several of which favored the Claimant. *See, e.g.*, *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (remanding: "Here, many of [the checklist factors] favor crediting Dr. Tate's assessment: Dr. Tate is a psychiatrist (not a psychologist), she saw Scott on a monthly basis, and

the treatment relationship lasted for over a year.  It is not apparent that the ALJ considered any of these factors."). This failure is a ground for remand. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) ("Here, the ALJ's decision indicates that she considered opinion evidence in accordance with §§ 404.1527 and 416.927. However, the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence.").

Finally, the Court will address the specific additional reasons the ALJ provided. Several of them are simply conclusory assertions. For example, the ALJ stated that "the objective evidence from the treatment notes, as summarized above, do not support the limitations stated by Dr. Burra[.]"  R. 28.  The generic catch-all phrase "as summarized above" is too vague because it forces the Court to unnecessarily hunt through a long factual narrative and then speculate about what the ALJ was specifically cross-referencing.  Slightly less vague, but still insufficient, the ALJ stated that the limitations set forth by Dr. Burra are not supported by the Claimant's activities of daily living.  Here, the ALJ at least included a narrative summary of these activities in the following paragraph. But the ALJ still did not analyze how the particular activities were inconsistent with the Claimant being able to work a full-time job. As the Seventh Circuit has repeatedly emphasized, an ALJ should examine these activities "with care" because "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Moreover, in recounting these daily activities, the ALJ did not fully consider the Claimant's testimony. For example, although the ALJ noted that the Claimant has a hobby of building model planes, the ALJ failed to include that the Claimant testified he does not spend much time on this hobby and usually gets bored and has to lie down. R. 75.

15

Finally, the ALJ asserted that the two treating physician's opinions could be disregarded because they gave different answers on the agency questionnaires as to how many pounds the Claimant could lift on the job. The ALJ listed this reason first and stated that the disparity between the doctors was "especially notable." R. 28. Accordingly, this disparity was the linchpin of the analysis. Here is the ALJ's explanation:

> [T]here is a marked disparity with the amount of weakness between the two medical source statements in that Dr. Lorenz opined that the claimant could lift a maximum of 20 pounds and Dr. Burra opined that the claimant could lift no more than five pounds. This is especially notable in that Dr. Lorenz and Dr. Burra are from the same orthopaedic office and aware of each other's treatment.

R. 28.

Although this inconsistency is a valid point and could be relied on to build a case for why the treating physicians' opinions should be given less weight, it is not enough by itself to carry the day, especially given that several checklist factors point the other way. Two basic points explain why more analysis is needed.

First, there is conflicting evidence across the board on this issue. As the ALJ reported, Dr. Burra estimated that the Claimant could only lift 5 pounds while Dr. Lorenz estimated that the Claimant could lift 20 pounds.[6] It is true that there is a disparity on its face. However, the disparity is not unique to these two physicians. Dr. Rafiq, who was the agency doctor who actually examined the Claimant and whose report Dr. Bone and Dr. Savage relied on, wrote that the Claimant reported that he could only lift five pounds, and in this report, Dr. Rafiq generally found that the Claimant "seemed reliable." R. 309. Thus, Dr. Rafiq's report provides support for Dr. Burra's 5-pound limitation. Relying on Dr. Rafiq's report, Dr. Bone estimated that the

---

[6] To be precise, Dr. Lorenz on the form stated that the Claimant could lift up to 20 pounds *frequently*, but he also stated that the Claimant could *occasionally* lift up to 50 pounds. R. 326. The ALJ ignored the latter part. Thus, the disparity is even starker than the ALJ reported.

Claimant could frequently lift 10 pounds, and could occasionally lift 20 pounds. (It is not clear how he derived these figures from Dr. Rafiq's report.) His estimate is thus roughly between that of Dr. Burra's and Dr. Lorenz's. At the hearing, the Claimant was questioned extensively about this issue. One reason for the lengthy questioning may have been because his answers were vague. Here is the relevant testimony:

> Q. Do you have any difficulty lifting?
>
> A. With my left shoulder.
>
> Q. Let me ask you like this. Using both of your hands together, what's the heaviest object that you're comfortable [lifting]?
>
> A. I don't know. I've never put no weight really on it. I don't lift nothing heavy. I know that.
>
> Q. With both of your hands could you lift a gallon of milk?
>
> A. Yes, I could.
>
> Q. That was a yes?
>
> A. Yes.
>
> Q. What about two gallons of milk with both hands?
>
> A. Yes.
>
> Q. Could you lift more than that?
>
> A. Probably.
>
> Q. Well, can you give us any kind of number about weight that you're comfortable carrying?
>
> A. With both arms or one?
>
> Q. Yes, with both.
>
> A. Probably about 50.
>
> Q. When was the last time you lift[ed] 50 pounds?

17

> A. It's been awhile.
>
> Q. How long is awhile?
>
> A. I don't remember. Awhile.
>
> Q. You can't be any more specific than that?
>
> A. No.
>
> Q. Now, what about just using your left arm? How much are you comfortable lifting with just your left?
>
> A. Probably lift I don't know. 50 pounds.
>
> Q. 50 pounds with your left arm?
>
> A. Yes.

R. 76-77. This testimony is not clear. The Claimant gives divergent answers, stating initially that he could not lift anything heavy, then stating that he "probably" could lift more than two gallons with both hands, but then ending up stating that he could lift 50 pounds with *only* his left hand, a feat that strikes this Court as being impressive for even a healthy 52-year-old man. A similar uncertainty was expressed by Dr. Savage who, although noting the disparity between the two doctors, speculated that Dr. Lorenz's statement about the Claimant lifting 50 pounds "might have been a misstatement." R. 45. In sum, although evidence on this point is varied, it is not simply that the two treating doctors' opinions differed and were thus arguably inconsistent, but that all the doctors (and even the Claimant) had different estimates. Moreover, although the estimates of the treating physicians diverged, each of their opinions had some arguable support from the agency physicians, with Dr. Lorenz's estimate falling roughly in line with Dr. Bone's, and with Dr. Burra's opinion finding support in the report of Dr. Rafiq. The bottom line is that the ALJ

18

should investigate this issue further on remand and make an attempt to resolve these discrepancies.[7]

Second, considering the larger picture, even if the two doctors differed on the Claimant's weight-lifting abilities, this discrepancy, by itself, is not a basis for simply disregarding their opinions in their entirety. The ALJ's analysis loses sight of the fact that the Claimant's lifting ability was only one part of the analysis. In fact, it does not appear to have been the main issue. In their forms, Dr. Burra and Dr. Lorenz made estimates about how long the Claimant could sit, how long he could stand, and how many days on average in a month he would have to miss. These assessments do not have an obvious connection to how much weight he could lift, but rather appear to be based on the Claimant's complaints of ongoing pain, which implicates the Claimant's second argument for remand. He argues generally that the ALJ ignored his claims of pain. This Court agrees. The ALJ provided little discussion of this issue, other than a fleeting assertion at the end of the analysis that she had "additionally taken into account the claimant's testimony as to shoulder pain." R. 28. Dr. Burra and Dr. Lorenz indicated in their assessments that the Claimant had ongoing neck and shoulder pain. *See, e.g.*, R. 324, 325, 375 (noting "deep pain"). He also had foot pain. The Claimant testified, for example, about constant burning pain in his shoulder. The ALJ never seriously considered this evidence.

---

[7] In his briefs, the Claimant offered an explanation for the divergence. He argued that Dr. Lorenz provided a more generous assessment of his weight-lifting capabilities because Dr. Lorenz was only treating the Claimant for spinal problems, which were less serious, while Dr. Burra provided more restrictive assessment because he was treating the Claimant's more debilitating left shoulder problems. This explanation is not obvious to this Court based on what the doctors wrote on the forms, but the Court need not assess this argument now, leaving the issue open for the ALJ to consider in the first instance on remand, along with all the other evidence and arguments. Another possible explanation, one not discussed by either side, is that Dr. Burra was evaluating only the Claimant's use of his left arm (a conclusion that finds support from his handwritten comment on the form) while Dr. Lorenz was evaluating his use of both arms. The Court leaves this issue to the ALJ to resolve.

For all the above reasons, the Court finds that a remand is warranted. The Court expresses no opinion about the ultimate disposition of this case. It may be that, with further development of the record and with a more detailed explanation that addresses all the lines of medical evidence, the reasons cited by the ALJ could be deemed sufficient to deny benefits.

**CONCLUSION**

For these reasons, the Claimant's motion for summary judgment is granted, the government's motion is denied, and the decision of the ALJ is remanded for further consideration.

Date: September 2, 2015  By: _____
Iain D. Johnston
United States Magistrate Judge